We've previously submitted Ziradnik v. Dutrybrook, and we'll take up Clifford v. Trump. May it please the Court, Madam Justices, and Justice Henry, we're here before you today following a decision made by the District Court applying the Texas Citizen Participation Act or an anti-SLAPP statute in connection with the defamation matter. Since the case was filed and briefed on this appeal, there has been a significant decision from the Fifth Circuit covering the Texas District Court, and that is Clockey v. Watson, which we have submitted to your honors. That was decided in October of this year, 2018, and we supplemented our briefs setting forth that decision. And I would like to discuss that decision and some other relevant decisions as it pertains to a decision you might make in this appeal. So the District Court in this matter decided after a conflict of laws analysis that the Texas Citizen Participation Act or an anti-SLAPP statutory scheme for early dismissal of a defamation case applied. The District Court then applied the Texas Citizen Participation Act or the TCPA and granted the special motion to strike or dismiss the plaintiff's defamation claim against Donald J. Trump. Upon that ruling, dismissing the plaintiff's claim, the District Court articulated that it was mandatory under the Texas anti-SLAPP statutes to award attorney's fees, and then upon that awarded attorney's fees and sanctions against Stephanie Clifford, the plaintiff in the case. The District Court remarked that attorney's fee award was not to be tethered to considerations of justice and equity and thereafter granted an attorney's fee award of $293,000 and a sanction of $1,000. The time span between the special motion pursuant to the Texas anti-SLAPP provisions and the District Court decisions, including the responses and briefing, was 48 days. The knockout was swift and punishing to the plaintiff. It's important to note that in the District Court's attorney fee civil minutes, the court gave attribution to the extensive factual exhibits and demonstratives prepared by the defendant. Notwithstanding, the District Court, in its decision that we appeal here, stated it only relied upon the complaint and the motion to strike and some judicially noticed facts, which were never fully detailed by the court in either order. So in Clockey v. Watson, the Fifth Circuit spoke about applying the Texas Citizen Participation Act or that anti-SLAPP provision in diversity cases and said it's not to be applied in diversity cases. Right, but you're in the Ninth Circuit and we've got the Planned Parenthood Federation case, and so I think our circuit precedent dictates a contrary result, doesn't it? No. And why is that? Because Planned Parenthood applied the California anti-SLAPP statute in its own venue and it's covering its own district courts and it's different from Texas. What's the distinction between California's anti-SLAPP statute and Texas that's in any way material to this analysis? Texas requires the move by a preponderance of the evidence, and then it shifts the burden to the plaintiff to show by clear and specific evidence, carry a burden beyond a prima facie case. This is not in the California anti-SLAPP statute. And also we have a Fifth Circuit decision covering that Texas statute applied in diversity cases. So I think it's a case of first impression for the Ninth Circuit at least because I don't think the Ninth Circuit, from what I've seen, has ever applied the Texas anti-SLAPP statute to any matter. I mean, this is the first. And the Fifth Circuit says no, and then, of course, we supplemented the orchestrate case from the District Court of Kansas that was going to apply a Texas statute, and then when Clockey came out in the reasoning which we submitted to Your Honor, they said no, it wouldn't be appropriate because the Fifth Circuit has spoken. It's not to be applied. So I think that Planned Parenthood certainly is distinguishable because it doesn't apply that statute. And to apply the Texas anti-SLAPP statute, you'd have to be in derogation of the Fifth Circuit's law on that issue. So in Clockey, it says we're going to resolve an issue. This is from the opinion that has been brewing for years in this circuit. We conclude that the Texas Citizen Participation Act does not apply to diversity cases in federal court, and we reverse and remand. The federal court should not apply a state law or rule if there's a federal rule of civil procedure that answers the same question. A state rule that conflicts with a federal rule of procedure when it imposes additional procedural requirements not found in the federal rules should never be applied. And it said that because of the burden-shifting framework of the Texas Act, it imposes an additional evidentiary weighing requirement and answers the same questions as those rules that the state and therefore the state law cannot apply. I thought it's interesting, too, because it refers to the Texas Act as providing procedural rules, which is certainly contrary to the federal procedural rules that are in play. And looking at the Texas statute, the first thing the movement has to do is establish an evidentiary burden of preponderance of the evidence, of the factors relating to the nature of the alleged defamatory communication. Second, the plaintiff then has the burden shifted to it, and it rebuts with clear and specific evidence, free from doubt, each of the elements of the claim. So immediately a district court is put into position under the Texas statute to have this burden shifting and then make decisions about the quality of the act rather than a straight 12B6 analysis. I know in Planned Parenthood this circuit said that you can apply the California statute, but you must, I think that the term was to avoid a stark collision with the federal rules, that's the term Judge Gould used, you must apply a 12B6 or a Rule 56 analysis. Texas statute would not allow that, and it's never been interpreted that way as far as I've ever seen. So the Ninth Circuit has kind of a hybrid solution to avoid that stark collision by saying that we're going to let it be applied, but it has to be applied in a 12B6 and a Rule 56 manner. If this court made that decision with regard to the Texas statute, you would not comply with the comedy of giving a cord in deference to sister circuits' decision making. That would be a rather extraordinary, I think, ruling. Judge Wardlaw, you've authored the opinion in U.S. versus, I think it's, what is it, off the top of my head, the entertainment company, AMC Entertainment, I think, with regard to a direct essential collision between the Fifth Circuit pronouncement dealing with a Texas citizen and the law that was in place for the Ninth Circuit. And the issues of comedy controlled, you have to give deference to the sister circuits. Or we have a situation like in the Kansas case, for example. What does Kansas follow, the Fifth Circuit or the Ninth Circuit, applying the Texas statute? And then can we just shop around and try to find a circuit that will apply the Texas statute rather than not apply it in their own Fifth Circuit? So the issues of comedy are real, and they're a direct, a head-on collision in the event that the court says, okay, we're going to disregard the Fifth, and we're going to use the Planned Parenthood hybrid and apply the Texas statute in California to a Texas citizen. So as I talked about this burden shifting, and Clocky said, it's not whether it's logically possible for a court to apply the requirements of both, but where the rules are sufficiently broad enough to control the issue before the court, the Texas Citizen Participation Act procedural provisions stand down. They're not to be applied. The federal rules of civil procedure are. The Fifth Circuit rejected application of the Texas statute under the burden shifting framework that it set out. And particularly, I think, persuasive and important is Justice Kavanaugh's opinion in Abbess, which is cited in our brief. And Justice Kavanaugh in Abbess says he directly discusses the concept of perhaps some kind of acceptance of the statute and then trying to dovetail or merge in federal rules of civil procedure. And he says this is almost identical to the defense's position in this case. In Abbess, the defense argued they tried to portray the D.C. anti-SLAPP statute, special notion to dismiss provisions as functionally identical to Rule 56 or Rule 12B6. And Justice Kavanaugh said the main problem is that it requires the court to rewrite the special motion to dismiss. Counsel simply wanted to permit the court's attorney's fee in the prevailing defendant's cases in these matters. It easily could have done so through enacting amendments to Rule 12B6 or Rule 56. The D.C. counsel instead enacted a new provision that answers the same questions, and the D.C. Court of Appeals has never interpreted the D.C. anti-SLAPP statute's acts likelihood of success standard to simply mirror the standards imposed by federal Rule 12 and 56. So the same argument was made there, and Justice Kavanaugh made it very clear. You have to rewrite 12 and 56 to try to dovetail in some kind of heightened burden shifting in these select cases based upon a state procedural law. Obviously, there's real eerie considerations as well, because it's clear that the Texas Citizens Participation Act is primarily procedural, not substantive. Before your time runs out, do you want to address the merits? What was that? Before your time runs out, do you want to address the merits? Certainly. I'd be happy to. I just have a few more comments, but I'll stop now and address any questions you have. How much time do I have? Your clock's running down. You have eight minutes left. I'd like to respond, and then I'll reserve five to respond to Mr. Harder's remarks. Let's assume, just assume that the TCPA applies here. What's your argument that you would win on the merits of your case? Let's assume the TCPA applies. Well, the ruling's already been made. If he applies the TCPA, I don't believe it was properly applied, and I do believe the court ---- Well, I guess I'll ask the question a different way. Does the defamation claim stand regardless whether TCPA applies? Well, I mean, obviously you ordered dismissal and awarded nearly $300,000. Right, but you're on appeal now. Right. What's your argument that you survive the TCPA motion? Oh, yes. If you don't ---- if the TCPA, which should not be applied according to Clawkey, is not applied, this is a well-pled complaint. And we look at your comments in Mekieff, the comments made in Planned Parenthood, the comments made by Judge Kuczynski, I believe it was, in Flowers. It's a well-pled complaint. It's going to survive even any Twombly or Iqbal challenges. So I think it's a well-pled complaint, and it's going to survive a 12B6 analysis. The court, in its decision, bootstrapped this 12B6 analysis into this heightened procedural matrix that the TCPA provided, and that's the problem. So I don't believe if we don't ---- and clearly Clawkey says you don't apply in a diversity case. Abbess says the same. But Clawkey being controlling because it's a Texas statute and the Fifth Circuit has spoken. I'd like to comment more on that, but can I reserve my five? Well, you actually have six, and you can reserve it. I'm sorry? You actually have six minutes, and you can reserve it. Okay. Thank you very much. Doesn't your clock show? Oh, it does. I didn't notice it. Yes. I'm sorry. I didn't notice the little clock down there. I apologize. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Charles Harder for Appellee, President Donald Trump. The district court in this case correctly held that Appellant's defamation claim had no legal merit pursuant to the TCPA. In doing so, the Court followed binding Ninth Circuit precedent and well-established Texas defamation law. Six weeks before this lawsuit was filed, Appellant Stephanie Clifford, a.k.a. Stormy Daniels, sued President Trump in a related case relating to an NDA agreement that she had signed in 2016. That case, that related case, was political in nature. The complaint in that case alleges at paragraph 17 that the President, quote, aggressively sought to silence Ms. Clifford as part of an effort to avoid her telling the truth, thus helping to ensure he won the presidential election, close quote. And at paragraph 51 of that same complaint, that related case, Ms. Clifford alleges that the President had her sign that NDA, quote, for the purpose of influencing the 2016 presidential election, close quote, and, quote, to prevent American voters from hearing her, Ms. Clifford, speak about Mr. Trump, close quote. That complaint itself, that related case filed six weeks before this case was filed, was political in nature. It was challenging the legitimacy of his presidency. Ms. Clifford and her lawyer, Michael Avenatti, then appeared on 60 Minutes to an audience of 22 million people and shortly thereafter went on The View, another national TV program, with an audience of approximately 3 million people. And then Mr. Avenatti, on his own, acting on Ms. Clifford's behalf, appeared on 54 more national TV programs attacking the President in various interviews. On 60 Minutes, he said that the acts of the President and others were, quote, thuggish behavior by people in power and it has no place in American democracy, close quote. On The View, Mr. Avenatti, talking about a raid on the President's lawyer's office, said the document sees, quote, could prove to be critically important as it relates to the future of the presidency, close quote. These are just a few examples that are in the record of the onslaught of publicity that Ms. Clifford and her attorney, Avenatti, attacking the President, challenging the issue of the legitimacy of his presidency, before the President sent the one tweet at issue in this case. And that one tweet was his only response to this onslaught of publicity by Ms. Clifford and Mr. Avenatti. The trial court did not abuse its discretion in judicially noticing the fact that there was a live, heated, public, political controversy between the President of the United States and Stephanie Clifford, a.k.a. Stormy Daniels. Those facts could not be seriously disputed and they are well within the purview of judicial notice. The tweet that's at issue in this case, and that must be reviewed in its full context, is attached as Exhibit E to our unopposed motion for judicial notice that's filed with this court. Now, the complaint that Ms. Clifford filed quotes the President in his tweet and makes a textual reference to what it was responding to, but it's important for the full context to be considered. And the case law says that the full context, excuse me, including photographs, needs to be taken into consideration. The President's tweet read, a sketch years later about a nonexistent man, a total con job playing the fake news media for fools, but they know it! Beyond those words, though, it's a retweet of a third-party tweet that showed a side-by-side image of a sketch of an alleged person that Clifford claimed had threatened her in a parking lot seven years earlier in 2011, next to an image of Clifford's own ex-husband. And the images, if you look at them, are virtually identical, and the third party who sent this original tweet included a tongue-in-cheek remark, oops, exclamation mark, this is awkward, exclamation mark, and included an emoji of embarrassment with red cheeks and bulging eyes. This was a hyperbolic statement being made by the third party. And the President made a hyperbolic statement accompanying that and retweeting it, and I read to you what he wrote. The Texas Court of Appeals has held, in REHAC Creative Services, context is important. Publications alleged to be defamatory must be viewed as a whole, including the accompanying statements, headlines, pictures, and the general tenor. Just as the third-party tweet was hyperbolic, saying oops, this is awkward, and the emoji and the side-by-side, likewise, the President's retweet was hyperbolic, playing the fake news media for fools, but they know it, with an exclamation mark, saying total con job. The district court got it right. This is vintage hyperbole, and it's vintage hyperbole where the President is stating his opinions. Can we back up? The TCPA, given that the Fifth Circuit does not apply the TCPA in federal court, why should we apply it here? That's a good question, and thank you for asking, and I was getting to that. The TCPA is substantive law in Texas. It provides for attorneys' fees to be awarded to the prevailing moving party. It's substantively identical. It's virtually identical in almost every single way to the California anti-SLAPP statute. The courts have held, and the Serafine Court and the Kinney Court both have held, that we've cited to them, that the TCPA was modeled after California's anti-SLAPP statute, and it's virtually identical to the statute. The only difference is actually in the standard, which doesn't even apply in federal court, because the long list of case law, and I know, Judge Wardlaw, you're very familiar with it, but there's not, excuse me, there's seven Ninth Circuit cases, which all hold that you apply anti-SLAPP statute in federal court, Newsham, Batzel, Hilton, Price, Makeoff, Meebo International, and Planned Parenthood, those seven cases, and Judge Wardlaw, you even wrote in your concurring opinion that Makeoff, when the plaintiff sought en banc review and it was denied, Your Honor, and three other judges joined you, wrote that Newsham and Batzel were correctly decided, and there's a terrific quote in there that says, though anti-SLAPP, through anti-SLAPP laws, the legislatures of Arizona, California, Guam, Hawaii, Nevada, Oregon, and Washington have decided to impose substantive limitations on certain state law actions, refusing to recognize these limitations in federal court as bad policy. If we ignore how states have limited actions under their own laws, we not only flush away state legislatures, consider decisions on matters of state law, but we also put federal courts at risk of being swept away by a rising tide of frivolous state actions that would be filed in our circuit's federal courts. It's good law in the Ninth Circuit to apply the anti-SLAPP statutes, and when you have the TCPA, which has been held by Texas law to be substantively identical to the California anti-SLAPP statute, there's no reason not to apply it. And let's consider also... The only reason is that had you brought this, or had this case been brought in Texas federal court, you would not have this motion available to you, right? At the time we filed it, the clock decision had not come about. If our case had preceded the clock decision, perhaps the Fifth Circuit might have been persuaded otherwise. I don't know. But the clock decision, and it's important because Newsham and Makoff and some of these other cases, a very important factor was forum shopping. Clock in the Fifth Circuit doesn't even mention forum shopping. And it's very important because, and it was central to this court's ruling, because if the federal courts are not going to consider anti-SLAPP, then why not, if you're a plaintiff, send all SLAPP cases to the federal court so you avoid the state legislatures and what they're trying to enact in their own states? I think clock and the Texas legislature are at odds, because the Texas legislature wants to get rid of SLAPP suits, as does the California legislature. This court correctly recognized that if the legislature wants to get rid of SLAPP suits, you apply the SLAPP statutes everywhere that they can be applied, including federal courts. Clock wasn't looking at forum shopping. I think it missed an important point, or maybe it just decided not to mention it. The president's words, as I was mentioning before, are vintage hyperbole made within heated political discourse. Words like playing the fake news media, they know it, exclamation mark, total con job. They signal to a reader that these are statements of opinion. These are classic rhetorical... And the inference is that this was made up or that Ms. Clifford was lying? Well, Your Honor, within the context, the full context, it's hyperbolic. It's an opinion. If the president had issued a statement that had nothing to do with what it was following, this oops, this is awkward, and the side-by-side, if the president had just taken a blank page and said, here are the facts, and if those facts happen to be incorrect, then it's possible, Your Honor, that this could be a statement of fact. But with the context, it's hyperbolic. He's taking a side-by-side and all the rest of it, this hyperbolic statement, with exclamation marks all over and emojis, and he's giving his own opinions. He's saying, essentially, when he says nonexistent and he says con job, he's saying, I don't believe this. I'm not buying it. My opinion is, I think she has a credibility issue or she has a veracity issue. I don't believe her story. It's the modern-day equivalent of calling B.S. or saying bunk or malarkey or hooey or garbage or I don't buy it. Now, taking the context, this sketch right here, this sketch, came from The View. The View show is when this was launched. Ms. Clifford and her lawyer went on The View and they said they had a sketch artist and she was describing to the sketch artist what the person looked like. The View had approximately 3 million people watching. Obviously, anyone at home is going to see the sketch and listen to the story and some of them take to social media. People watching The View, some of them go to social media and say, I believe her story and some of the people watching say, I'm not buying it. Some people may say, nonexistent man. I'm talking about third parties who are watching the show who take to social media. They'll tweet out or they'll go to Facebook or Instagram and they'll say, I think she's playing the fake news media for fools and I think that the media is going along with it. But in essence, isn't what President Trump is saying, he's saying that Ms. Clifford was lying about being threatened by Trump or his agents and isn't that a fact that can be proven true or false? He didn't use those words, though. He used the words nonexistent man. In his opinion, this man is nonexistent based on the context of the fact that, because within this tweet he's saying why he comes to the opinion that he comes to. He comes to the opinion because he says it's a sketch years later. This sketch came seven years after it supposedly had happened. And he also says it's following on with this side-by-side that he looks exactly like the ex-husband. He's saying, I don't believe it. He doesn't use the words that you used, Your Honor. It's possible that he could have used different words in a different context and have communicated what you are saying. But do the words, I mean, the precise words, if they convey the same meaning, do they really make a difference as long as it's reasonably understood to mean that she's lying? The answer is within the context, it's an opinion. Within a different context, he could have communicated something to the effect of that she's lying. However, context is very important. And we talk about some cases where, in Greenbelt Cooperative v. Bressler, the defendant accused the plaintiff of blackmail, blackmail, which is a crime. And every court in the state of Maryland sided with the plaintiff. In fact, the plaintiff won actual and punitive damages at a trial. And the very highest court in Maryland agreed with the plaintiff, and it went to the U.S. Supreme Court. The U.S. Supreme Court reversed, and not only that, reversed unanimously. All nine justices of the Supreme Court reversed and said blackmail in this context is not defamatory. It's hyperbole. It's a, quote, rhetorical hyperbole, a vigorous epithet used by those who considered the plaintiff's negotiating position extremely unreasonable. Also take a look at the case of Green v. State. It's a Louisiana appellate case from 2009. The defendant called the plaintiff a state employee, a pathological liar. It was held to be not defamatory, but protected free speech. Why? Because of the context. In Rehab Creative Services v. Witt, Texas, 2013, a candidate for U.S. Congress said that her opponent was, quote, ripping off taxpayers, bilking taxpayers. That's a crime. And identified the plaintiff's company, Rehab Creative Services, which is a marketing company, as being part of this criminal scheme. Rehab sued for defamation. The court took the entire publication in context and said it's nothing more than, quote, rhetorical hyperbole, an attempt to deliver a political message about the use of public money in an exaggerated, provocative, and amusing way. And, Your Honor, what we have here is a provocative, exaggerated, perhaps attempt to be amusing way of saying, I don't buy it. And that's exactly what the district court held it to be, because of the political context, which is part of context, and because of the retweet, and because of the exclamation marks and the emojis and the way that the district court used media for fools. I mean, that is communicating to a reader. It's all about the reader. If the reader in the context is led to believe that he's making a true statement of fact, this is a statement from the president in some sort of an official way, or something that's meant to really communicate fact, that's one thing. But the context of this is very different. It's hyperbolic through and through. The political context, the thing that it's referring to at the bottom, and then the words that he uses with inishcaps, fake, news, media, and fools, they know it, an exclamation mark. He's communicating to the reader, this is hyperbolic. Rehack and some of these other cases involved actual political adversaries or politicians. Is there anything in the record that would support Ms. Clifford as a political adversary of President Trump? Yes, Your Honor, and I started out my time talking about that. Her related lawsuit, it was deemed related by Judge Otero. It comes straight out of the gate swinging, saying that the actions that he took were to ensure that he won the presidential election, that he was safe from hearing her speak on the eve of the presidential election. And she went on 60 Minutes, and she went on The View, and her lawyer acting on her behalf, talking about thuggish behavior by people in power. It has no place in American democracy. It could prove to be critically important as it relates to the future of the presidency. All those quotes. This is a political adversary who's filing lawsuits against him, and this particular lawsuit is a slap suit. It's an attempt to make the president stop talking. They want to be able to go on 54 national news programs attacking him, and when he makes one statement, they want to stop him from talking by suing him. And the district court recognized that that was a slap. Your Honor, in addition, Judge Otero found that the complaint also fails based upon actual malice, because the factual allegations that the plaintiff made were inconsistent and actually undermined and made it impossible for her to prove actual malice. She alleges at paragraph 32 that the president, quote, would have no way of knowing as to whether the incident occurred, close quote. Well, for actual malice, you have to prove that the president, quote, had a high degree of awareness of the probable falsity of his statements, close quote, at the time he posted the tweet. At paragraph 18, she alleges that Mr. Trump, at the time Mr. Trump made the statement, Mr. Trump knew his statement was false or was made with false evidence. She's, under Iqbal and Twombly, she's taking the elements and just parroting the elements. But when you look at the facts that she alleges, the facts that she alleges completely undermine her actual malice allegations. She also opens the door to an obvious alternative explanation. She talks about few people would know of the possible in-touch story. Her ex-husband knew of the story. Her ex-husband went to the reporter against her will, against her will, against her will. And he went to her and asked for her approval and discussed it with the reporter. And she talks about that in paragraph 6. And then in paragraph 7, she says that a few weeks later, she was threatened. A few weeks after her ex-husband had approached the magazine without her approval. And the ex-husband acting without her approval, talking to the magazine, is definitely an obvious alternative explanation for, assuming that this person exists and actually encountered her in a parking lot, the ex-husband is an obvious alternative explanation for how that could come about. And under Twombly, you can't have an obvious alternative explanation. And if you do, you can't have a cause, you can't have actual malice. The standard of review for the district court is abuse of discretion, meaning exceeding the bounds of reason. Judge Otero even asked Counsel for Clifford at the hearing, how would you amend your pleading if I was to give you leave to amend? He did not identify a single new fact that would be alleged. Not a single one. So it's hard to say that the judge abused his discretion in denying leave to amend under that record that we have. The judge also found that her reasoning was circular. She said, I need discovery in order to make my case. She said, I need to determine if the President knew anything about this. And the court felt that that was undermining her allegation that the President may have known. And she even undermines herself, her own allegations. Do I still have time or have I run out of time? You've run out of time. You're over. Your Honors, I think Mr. Harder made the point better than I could ever make it. He had no response to Clawkey, no reaction to the comedy that's required for this court to give a sister venue. He got up and argued facts. Facts about how many people watched the view, facts about what tweets existed otherwise, facts, all kinds of facts. It's a 12B6 analysis if you're going to apply Planned Parenthood, which under the Fifth Circuit you should not apply this. But it's all facts. He said it's all in the context. And then he went on to say that what all the facts were, 3 million people watched the view. Do you know what Mr. Trump meant? It's all about the readers and what the readers believed. How would anyone make a decision on that basis? I mean, he did it in his brief. He went on to talk about how many movies Ms. Clifford appeared in, all the smearing that could be done in front of the judge down below, and he's done it here. The facts, we should be judging this on the complaint and the application, if you choose to do so, of the Texas anti-SLAPP statute. But it's all about what he knows that she watched and what her lawyer may have said on some program. How are those facts before you? That is the maddening issue in this case. How can a judge, without giving an opportunity whatsoever to even rebut any of the issues, in a summary judgment, for example, or in any other fashion, make a decision? And you can tell it from Judge Otero's opinion. He talks about what Mr. Trump probably meant. He talks about the relationship between the two of them being a rival, a political rival. None of that is before the court. None of it is asserted as facts before the court. He does say this. He said, I took judicial notice of a matter that has been filed before me, and Mr. Harder referenced it. He said that he obtains a release with regard to anyone that may have interfered with her right to privacy. It was negotiated at the time and known by Trump at the time that this man had accosted and threatened an assault upon her. It was in the contract, but then they claimed that we don't know anything about it now. What he said is you're a liar. What he said is you're a con. What he said is that the media is going to accept your lies and perpetuate it. This is a man that has 17 million viewers on Twitter. I'll throw a couple facts you can take judicial notice of. The National Archives will keep his tweets because he announces government policy. He announces decisions about the president, what he's going to do on various matters. That's the program, that's the format that he issued this defamatory statement under. Does that not deserve some analysis other than, oh, well, we know what he's talking about? Now, let me point to something that, Justice Worlau, that you pointed out. Justice Otero says this in his opinion. The plaintiff correctly points out that Trump's tweet contains two verifiably true or false statements. That is contra to hyperbole. He then cites three cases in support of his analysis for the 12B6 kind of merging of the Texas Citizens Participation Act or anti-SLAPP. All three cases are after discovery. He cites Bentley, it was a jury trial. Milkovich, it was a summary judgment. Rehack was extensive affidavits received by the court to make a decision. None of that occurred here. There's got to be an evidentiary basis before you make all these conclusions about the goodwill of this man, who his default is to be reckless in his statements and use recklessness. That is his default daily. I'm proud of my client for standing up and fighting here. And we all should give her a fair opportunity in court. To do otherwise is just to roll on down the street and assume that this man's trespasses can be ignored. And so if you look at the fundamental substance of law of Texas, and actually it's cited just in passing by Justice Judge Otero, talks about what hyperbole is. Or he talks about whether it can be still defamatory, even though you may claim it. And he says this, it says, by calling Bentley corrupt, this was a judge. And it happened to be on a public access television show, and they were accusing the judge of being corrupt. By calling Bentley corrupt, and they took the position that it was just hyperbole or just exaggeration, Button testified that he intended the words ordinary meaning dishonest, unethical, shady, and unscrupulous. We think that is what any reasonable viewer would have understood. While the word may be merely an apathetic in the context of amorphous criticism, it also may be used as a statement of fact that can be proved true or false. That's what Judge Otero claimed, that the statements of the tweet could be proved true or false. Now counsel cites these cases, not a single case I'm aware of that he has cited, and I've read them, have applied the Texas Citizens Participation Act in a federal diversity case that I'm aware of. The Ninth Circuit, or the Fifth Circuit, says you cannot do that. The District Court in Kansas abided by that. He cites in his brief at page 12 this case called Seraphine, but he fails to tell the court that he quotes from the concurring opinion instead of the majority opinion. And he puts the cite out as a Ninth Circuit case. It's not a Ninth Circuit case, it's a Texas case. And it says this, this is not, this is a Texas decision. This is not to say the TCPA is comparable to the California anti-SLAPP for that, or any other states in all material respects, nor that textually similar provisions must be necessary, be construed in the same way. This court did not hold otherwise in Kinney. He cites the concurring opinion, but he doesn't cite the fact that the Texas court said that. They're not comparable, and they don't take that position. I think the issues of comedy really, Judge Wardlaw, particularly as you set forth in the U.S. versus AMC, these are real serious, really constitutional-driven, prominent decisions. To make a decision different from a sister circuit, applying the state law of a case that they oversee, would just terribly be disruptive. And it would throw into even more chaos this issue of applying these anti-SLAPP statutes. And you can't just generalize and say you can apply an anti-SLAPP statute, because the devil's in the detail. Texas is way out there. It's got burden shifting. It's got the duty and responsibility to go forward. And now you can see how difficult that is. He just loaded the record with all the speculation in the lower court as well. He said it's judicial notice to take newspaper articles, television shows. This is in the brief. And this is the way they wound in and really attacked the matter before District Judge Otero. Over your time, if you want to wrap it up, I gave you a couple minutes, because I gave the other side a couple minutes. Thank you very much, Judge. I do think that if you read the Bentley case, which is a Texas Supreme Court decision, that you'll find that the substantive law in Texas dealing with slander or defamation, once it can be proved false or true, you get outside this idea of it being rhetorical hyperbole. They do say that a rhetorical question is different from rhetorical hyperbole. That's addressed in Backus v. Miskow, which is cited by Judge Otero but not followed by him, because directly citing distinguishing hyperbole is whether it's provable by fact or not. In spite of the fact that he says it is, then he calls it hyperbole. We're dealing with the relator in this case, Mr. Trump, and few cases really deal with the issue of who the spokesperson is. One is the Woods case that was decided, I think it's in Ohio, James Woods, the actor. And the court really focused upon the damage one can do when they have such a great following. He had 350,000 followers on Twitter. And the court spoke about it's not just how to respond to somebody like that, but the damage and the inability to respond that brings someone to the courtroom. All right, counsel. Well, you're well over your time at this point, so thank you very much. You gave me a couple of minutes. I apologize. Thank you. Thank you very much. I appreciate this. Thank you very much, too. Klippard v. Trump is submitted, and this session of the court is adjourned for today. Thank you both. All rise. Ms. Karpour, this session is now adjourned.
judges: Thomas, Wardlaw, Nguyen